**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| JENNIFER FORD HERNANDEZ | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action File No. _____ |
| | * | |
| OCWEN LOAN SERVICING, LLC , and | * | **JURY DEMANDED** |
| U.S. BANK, N.A. | * | |
| | * | |
| Defendants. | * | |
| _____ | * | |

**COMPLAINT**

COMES NOW Plaintiff, Jennifer Ford Hernandez (hereinafter "Jennifer" or "Plaintiff"), and brings this Complaint against Ocwen Loan Servicing, LLC ("Ocwen") and U.S. Bank, NA ("US Bank") collectively ("Defendants"), showing this Honorable Court as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff, Jennifer Ford Hernandez, is a citizen of the State of Tennessee.

2. Ocwen is a foreign corporation with its principal place of business located at 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409. Ocwen's registered agent for service of process in Florida is Corporation Service Company 1201 Hays Street, Tallahassee, Florida 32301.

3. Defendant US Bank is a national banking association organized under the laws of the United States with its headquarters located in Cincinnati, Ohio. US Bank does business in Florida and has tens of thousands of customers in Florida.

4. There is complete diversity of citizenship between Jennifer and Defendants and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.  Therefore this Court has subject matter jurisdiction over the claims asserted herein according to 28 U.S.C. § 1332.

5. This Court has personal jurisdiction over Ocwen.

6. This Court has personal jurisdiction over US Bank.

7. Because of the substantial business contacts which US Bank has in this district and division, US Bank is deemed to reside in this district and division.

8. Venue is proper in this district according to 28 U.S.C. § 1391(b)(1).

1

9. Venue is also proper in this district according to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## OPERATIVE FACTS

10. On April 29, 1994, Freddie Ford, Jennifer's father, and Annette M. Erckman, Jennifer's stepmother, purchased their family home located at 165 Nelson Drive, Brighton, Tennessee 38011 (hereinafter, referred to as "the Property") for $85,000. At that time, the property was financed with a mortgage, which was secured by a Deed of Trust and Note, with an original principal sum of seventy four thousand dollars ($74,000).

11. On November 28, 2008, Freddie Ford and Annette M. Erckman executed a Quit Claim Deed in which they conveyed all of their legal interest in the Property to Jennifer who resided at the Property. On that same day, Freddie Ford and Annette M. Erckman executed contracts for the sale of the Property to Jennifer. Contract with Freddie Ford attached hereto as Exhibit 1.

12. In January 2009, Freddie Ford moved from 165 Nelson Drive. At that same time his wife, Annette Erckman, who was terminally ill, moved to Michigan to the home of her mother who cared for Annette until her death in October 2009.

13. On August 26, 2009, Freddie Ford executed a general durable power of attorney in which his daughter, Jennifer, was designated as Freddie Ford's attorney in fact. Power of Attorney attached hereto as Exhibit 2.

14. Sometime around August 26, 2009, Jennifer was added to the mortgage account serviced by GMAC, which was later transferred to Ocwen.

15. At all relevant times, US Bank owned the loan and at all relevant times, Ocwen serviced the loan. Substitution of Trustee attached as Exhibit 3.

16. On March 1, 2013, a non-HAMP Loan Modification Agreement was entered into for the loan on the Property, which modification stated that the amount payable under the Note and Security Instrument ("Principal Balance") was $9,779.75. Loan Modification Agreement attached hereto as Exhibit 4.

17. In February 2015, Jennifer wired $9,626.58 to Ocwen to pay toward the mortgage on the Property. Ocwen Payment History attached hereto as Exhibit 5.

18. When Jennifer sent the money to Ocwen in February 2015, there was an escrow shortage on the account in the amount of $5,056.82. Ocwen Payment History attached hereto as Exhibit 5.

19. Ocwen applied the $9,626.58 to Jennifer's loan as payments and fees, which brought the loan current and left a positive escrow balance of $480.18. Ocwen Payment History attached hereto as Exhibit 5.

20. On May 5, 2015, Ocwen disbursed funds in the amount of $3,652.92 from Jennifer's escrow account to pay the homeowner's insurance on the Property, which was insured by Farmers Insurance. Ocwen Payment History attached hereto as Exhibit 5.

21. On May 23, 2015, Jennifer's home was partially destroyed by fire. Because of the fire, Jennifer was forced to move into an apartment so repairs could be made. Because Jennifer could not take all of her possessions with her to the apartment she locked most of her personal belongings, such as family photos, family bible, papers and other documents in the garage of her home.

22. On July 14, 2015, Ocwen provided a "Payoff Quote" to Jennifer, which showed that the entire payoff amount for the loan was $13,246.99. Payoff Quote attached hereto as Exhibit 6.

23. The $13,246.99 payoff quote included $9,429.09 in principal on the Note, $3,172.74 in escrow, $176.82 in interest, and approximately $468.34 in fees and other charges. Payoff Quote attached hereto as Exhibit 6.

24. On July 16, 2015, Jennifer mailed a check via FedEx to Ocwen in the amount of $13,246.99 to pay off the loan in full. Check attached hereto as Exhibit 7.

25. Ocwen knew that the check was mailed in response to Ocwen's July 14, 2015 "Payoff Quote" and Ocwen knew that it was supposed to be applied to the mortgage to pay off the loan.

26. Jennifer believed that Ocwen would do the right thing and apply the $13,246.99 to pay off the loan.

27. Ocwen advertises on its website that "doing what is right always is the cornerstone of our success. Integrity is the core to our business and essential to every service we perform. We take pride in following a comprehensive compliance and risk management system, which includes

3

internal controls and regulatory adherence." Excerpt from Ocwen's website attached hereto as Exhibit 8.

28. Ocwen advertises further that "we are committed to helping each homeowner better afford and stay current on their mortgage loan. We care that our customers stay in their homes." Excerpt from Ocwen's website attached hereto as Exhibit 9.

29. Unfortunately for Jennifer, Ocwen failed to do what was right and failed to commit to help Jennifer stay in her home. Ocwen did the exact opposite and did it intentionally.

30. At all relevant times, Jennifer was in contact with an assigned Ocwen account representative who knew that the $13,246.99 was to be applied to pay off the mortgage on the Property. An assigned Ocwen account representative told Jennifer that the $13,246.99 was going to be applied to pay off the mortgage in full and that there was nothing further that she needed to do in order to have her loan paid off in full.

31. Ocwen received and cashed the check; however, unbeknownst to Jennifer, rather than applying the check to Jennifer's loan, Ocwen placed the $13,246.99 in a "suspense account."

32. Jennifer spoke with Ocwen representatives who told her that the $13,246.99 was being applied to the loan and that the loan was considered paid in full.

33. A short while after Jennifer sent the funds to pay off her loan in full she learned that Ocwen was claiming that her account was past due and was in the process of foreclosure.

34. Jennifer began begging Ocwen to stop the foreclosure and to send her clear title to her home so she could begin the process of repairing the home with her insurance company.

35. There were numerous phone calls and faxes sent by Jennifer to Ocwen trying to get them to stop the foreclosure process and pay off the loan. Enclosed for example is one such letter dated October 26, 2015, attached hereto as Exhibit 10.

36. Rather than apply the $13,246.99 to pay off the loan, Ocwen began adding charges to Jennifer's account and commencing foreclosures. Each time the foreclosure process would commence – and before the foreclosure sale date – Jennifer would be promised by Ocwen that they would apply the funds and pay off her loan and would cancel the foreclosure sale date. This process continued repeatedly for more than a year and a half.

37. Jennifer relied on Ocwen's repeated promises that it would cancel her loan and would send her the cancellation of her loan.

38. Sometime after Jennifer moved out of her home, Ocwen came into Jennifer's home and rummaged through and threw away her personal belongings that were stored in her garage. This included all of her family photos, bible, the deeds to her home, the contract between Jennifer and Annette Erckman, and other important possessions. *See* paragraph 11 of the Complaint.

39. At some point, Jennifer was told by Ocwen that it did not apply the $13,246.99 to pay off the loan because she did not sign an affidavit that Ocwen wanted signed. Jennifer told Ocwen she had never been told of any such affidavit.

40. On October 19, 2015, Ocwen sent Jennifer a Payoff Affidavit, which stated that Ocwen would apply the $13,246.99 toward the payoff of the loan only on the condition that Jennifer "under[stood] that the funds [were] not sufficient to pay off the aforementioned loan, and [she] [would] be responsible for an/all additional funds needed. [She] [understood] the additional funds in the amount of $1,538.49 must be submitted to the Insurance Loss Department along with [the] completed affidavit in order to pay off and satisfy the loan." October 19, 2015 Payoff Affidavit attached hereto as Exhibit 11.

41. Ocwen sent a Payoff Quote dated October 7, 2015, which was valid through October 30, 2015, in the amount of $14,785.48. October 7, 2015 Payoff Quote attached hereto as Exhibit 12.

42. Jennifer refused to sign the affidavit and pay the money Ocwen demanded because she did not owe it. These additional sums allegedly owed were fees and expenses Ocwen added to Jennifer's loan after she had sent in the money to pay off the loan. *See* Exhibit 12 Payoff Quote.

43. On June 21, 2016, Ocwen sent Jennifer another affidavit to sign in order to apply the funds to her account. June 2016 Affidavit attached hereto as Exhibit 13.

44. As of four days earlier, June 17, 2016, the amount Ocwen claimed Jennifer owed on her account was now $19,251.49! June 17, 2016 Account Statement attached hereto as Exhibit 14.

45. By July 26, 2016, the amount had increased to $20,356.00. July 26, 2016 Account Statement attached hereto as Exhibit 15.

46. Jennifer refused to sign the affidavits and pay the money Ocwen demanded because she did not owe it.

47. For over a year and a half Jennifer's home was repeatedly placed in foreclosure and then postponed after Ocwen promised to apply the funds and cancel her loan. Attached are some of the Notice of Sale Postponements dated May 16, 2016 through December 22, 2016, Exhibit 16.

48. Between July 2015 and January 19, 2017, Ocwen trespassed on Jennifer's property throwing away all of her personal belongings and even changed the locks on her home.

49. Without Jennifer knowing it, Ocwen sold her home at a foreclosure sale on January 19, 2017.

50. Because Jennifer and her husband are long distance truck drivers they are away on the road for several days, sometimes for weeks, at a time.

51. Shortly after January 19, 2017, Jennifer was back in town and went to her home and found that it was occupied by the person that bought it at the foreclosure sale on January 19, 2017.

52. Jennifer was extremely upset on learning that she had lost her home.

53. Jennifer called Ocwen and was told that her home sold for approximately $29,000.00 and there was nothing she could do to get her home back.

54. Because of Ocwen, Jennifer has lost her home, almost all of her personal belongings including important papers such as her deeds from her dad and her stepmom, cherished family photos, and their family bible.

55. Jennifer has become physically sick as well as emotionally devastated by the way she has been treated by Ocwen.

56. On top of losing her home and almost all of her personal belongings, Ocwen still has the $13,246.99 Jennifer sent Ocwen on July 16, 2015 to pay off her home.

57. Jennifer, at present, has no place to live other than with her husband in truck stops and in their truck.

### **FIRST CLAIM -- FRAUD**

58. Jennifer incorporates all of the other paragraphs of this Complaint as if fully stated herein.

59. Ocwen engaged in a pattern and practice of defrauding Jennifer in that, while Ocwen serviced the loan, Ocwen failed to properly credit payments made by Jennifer to pay off the loan which failure to payoff Jennifer's loan caused Ocwen to foreclose on the Property based upon Jennifer's alleged non-payment which Ocwen knew to be false.

60. Ocwen had actual knowledge that Jennifer paid the mortgage in full in July 2015.

61. Ocwen received the check from Jennifer in the amount of $13,246.99, cashed the check, and told Jennifer that there was nothing else she needed to do with regard to paying Ocwen in full.

62. Jennifer relied on Ocwen's account representative who told her that the $13,246.99 was being applied to pay off the mortgage in full.

63. Notwithstanding its knowledge that Jennifer paid the mortgage in full in July 2015, Ocwen inaccurately and recklessly maintained Jennifer's loan and used the inaccuracy to foreclose on the Property which had substantial equity.

64. Jennifer provided proof to Ocwen that the mortgage was paid in full; however, Ocwen foreclosed on the Property in January 2017 anyway.

65. Ocwen made false representations regarding the payoff of Jennifer's loan, intending to induce her reliance, which caused her justifiable reliance, resulting in damages, loss of her property, and severe physical and mental distress.

66. On July 14, 2015, Ocwen sent a "Payoff Quote" to Jennifer, which indicated that the total amount to pay off her loan with Ocwen was $13,246.99. 07/14/2015 Payoff Quote attached as Exhibit 5.

67. The Payoff Quote had an expiration date of July 17, 2015.

68. On July 16, 2015, Jennifer sent a check in the amount of $13,246.99, i.e., the "payoff amount" to Ocwen via FedEx.

69. Ocwen received the $13,246.99 check on July 17, 2015.

70. The check was endorsed by Jennifer and included a notation that it was intended for the "lien holder exposure portion only", i.e., Ocwen.

71. Jennifer called Ocwen to inquire why Ocwen foreclosed and why the loan was not paid in full. Ocwen advised Jennifer that the loan was not paid because Ocwen did not receive the July 2015 payoff amount until July 27, 2017, which according to Ocwen was late.

72. Ocwen's representation to Jennifer that it did not receive the July 2015 payoff until July 27, 2017 is false.

73. Jennifer told Ocwen that she had information showing that Ocwen received the check in the amount of $13,246.99 on July 17, 2015 via FedEx. When confronted with this

information, Ocwen told Jennifer that even if the money was received on July 17, 2015, Jennifer failed to sign an affidavit allowing Ocwen to apply the funds to pay off her loan.

74. No one from Ocwen ever told Jennifer anything about an affidavit until months after she sent the $13,246.99 check to Ocwen to pay off her loan.

75. By the time Ocwen informed Jennifer about the purported need to sign an affidavit, Ocwen had added more than one-thousand dollars to Jennifer's Payoff Quote, which should have been paid in full in July 2015.

76. Ocwen made false representations to Jennifer regarding the payoff of her mortgage and thereafter serviced the loan fraudulently and/or with reckless disregard of the truth.

77. In January 2017, Ocwen foreclosed on Jennifer's Property, affirmatively stating that Jennifer was in default on her mortgage.

78. Ocwen's representation that Jennifer was in default was fraudulent and Ocwen knew that it was in possession of $13,246.99 to pay off the mortgage.

79. As the owner during the time that Ocwen serviced the loan, US Bank is vicariously liable for Ocwen's actions. *See, Lee v. Equifirst Corp.*, 3:10-CV-809, 2010 WL 4320714, at *10 (M.D. Tenn. Oct. 26, 2010).

80. As a direct and proximate result of Ocwen's fraudulent conduct, Jennifer suffered general and special damages in an amount to be determined at trial. Additionally, Ocwen acted with actual knowledge, malice, fraud, and/or oppression, and thus, Jennifer is entitled to an award of punitive damages.

## SECOND CLAIM – CONVERSION

81. Jennifer incorporates all of the other paragraphs of this Complaint as if fully stated herein.

82. Conversion is the appropriation of property to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right. *Williamson v. Ocwen Loan Servicing, LLC*, 3:09-0514, 2009 WL 5205405, at *6 (M.D. Tenn. Dec. 23, 2009).

83. Ocwen foreclosed on Jennifer's Property without a legal right to do so and has exercised dominion or control over the Property in defiance of Jennifer's legal right to the Property.

84. Ocwen remains in possession of the funds in the amount of $13,246.99, which should have paid off Jennifer's mortgage and which belong to Jennifer.

85. Prior to and after the foreclosure of Jennifer's Property, Ocwen, by and through its agents, took Jennifer's personal belongings from the Property.

86. Among other personal belongings, Ocwen took Jennifer's family pictures, bibles, important papers, jewelry, clothing, household items, tools, and other items that were stored at the Property.

87. Jennifer demanded return of those items and Ocwen failed to return Jennifer's personal belongings.

88. Jennifer has demanded that Ocwen return the Property, money, and personal belongings to her.

89. As the owner of the loan during the time that Ocwen serviced the loan, US Bank is vicariously liable for Ocwen's actions. *See, Lee v. Equifirst Corp.*, 3:10-CV-809, 2010 WL 4320714, at *10 (M.D. Tenn. Oct. 26, 2010).

90. As a direct and proximate result of Ocwen's conversion of Jennifer's Property, belongings, and payoff funds, Jennifer suffered general and special damages in an amount to be determined at trial. Additionally, Ocwen acted with actual knowledge, malice, fraud, and/or oppression, and thus, Jennifer is entitled to an award of punitive damages.

### **THIRD CLAIM – TRESPASS**

91. Jennifer incorporates all of the other paragraphs of this Complaint as if fully stated herein.

92. After Jennifer paid off her mortgage, and before the January 2017 foreclosure, Ocwen and its agents and/or representatives trespassed on Jennifer's Property and stole Jennifer's personal belongings.

93. Because Jennifer paid the mortgage in full in July 2015, Ocwen did not have any right whatsoever to go on Jennifer's Property.

94. Ocwen continues to trespass on Jennifer's property and has exercised dominion and control over Jennifer's Property such that Jennifer cannot enjoy her home.

95. As the owner of the loan during the time that Ocwen serviced the loan, US Bank is vicariously liable for Ocwen's actions. *See, Lee v. Equifirst Corp.*, 3:10-CV-809, 2010 WL 4320714, at *10 (M.D. Tenn. Oct. 26, 2010).

96. As a direct result of Ocwen's conduct, Jennifer suffered general and special damages in an amount to be determined at trial.

## FOURTH CLAIM – WRONGFUL FORECLOSURE

97. Jennifer incorporates all of the other paragraphs of this Complaint as if fully stated herein.

98. A claim for wrongful foreclosure is recognized under Tennessee law. *Harris v. LNV Corp.*, 2014 WL 3015293, *11 (M.D. Tenn. July 2, 2014).

99. Jennifer paid Ocwen $13,246.99 to pay off her mortgage in July 2015.

100. In January 2017, even though Jennifer paid the mortgage in full in July 2015, Ocwen foreclosed on Jennifer's property.

101. Ocwen wrongfully foreclosed on Jennifer's property by failing to apply the $13,246.99 to Jennifer's loan.

102. As a direct result of Ocwen's conduct, Jennifer suffered general and special damages in an amount to be determined at trial.

103. As the owner of the loan during the time that Ocwen serviced the loan, US Bank is vicariously liable for Ocwen's actions. *See, Lee v. Equifirst Corp.*, 3:10-CV-809, 2010 WL 4320714, at *10 (M.D. Tenn. Oct. 26, 2010).

104. As a direct result of Ocwen's conduct, Jennifer lost her possessory interest in the home and the value of her home which was paid in full and is estimated to be worth more than $125,000.00.

## FIFTH CLAIM – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

105. Jennifer incorporates all of the other paragraphs of this Complaint as if fully stated herein.

106. The tort of intentional infliction of emotional distress requires that the plaintiff satisfy three elements: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1999).

107. Ocwen intentionally and/or recklessly foreclosed on Jennifer's home even though Jennifer paid the loan in full in July 2015.

108. Ocwen's conduct of wrongfully foreclosing and causing Jennifer to lose her home can only be described as so outrageous that it is not tolerated by civilized society.

109. As a direct result of Ocwen's conduct, Jennifer suffered severe emotional distress which manifested itself through constant anxiety about losing her family home, her personal belongings, and her money.

110. As the owner of the loan during the time that Ocwen serviced the loan, US Bank is vicariously liable for Ocwen's actions. *See, Lee v. Equifirst Corp.*, 3:10-CV-809, 2010 WL 4320714, at *10 (M.D. Tenn. Oct. 26, 2010).

111. As a direct and proximate result of Ocwen's conduct, Jennifer suffered general and special damages in an amount to be determined at trial. Additionally, Ocwen acted with actual knowledge, malice, fraud, and/or oppression, and thus, Jennifer is entitled to an award of punitive damages.

## SIXTH CLAIM –MISREPRESENTATION

112. Jennifer incorporates all of the other paragraphs of this Complaint as if fully stated herein.

113. A claim based on intentional or reckless misrepresentation requires the plaintiff to allege and show that: (1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation. *Walker v. Sunrise Pontiac–GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008).

114. Ocwen misrepresented to Jennifer that when she sent the $13,246.99 to Ocwen the loan would be considered paid in full.

115. Jennifer relied on Ocwen's representation that the $13,246.99 was going to be applied to the loan and the loan was going to be considered paid in full.

116. Ocwen's representation regarding the payoff of the loan was false.

117. Ocwen's false representations were made knowingly and/or recklessly and caused Jennifer to reasonably rely on Ocwen's representations that the loan was paid in full.

11

118. As a result of Ocwen's false representations, Ocwen foreclosed on Jennifer's home in January 2017.

119. As the owner of the loan during the time that Ocwen serviced the loan, US Bank is vicariously liable for Ocwen's actions. *See, Lee v. Equifirst Corp.*, 3:10-CV-809, 2010 WL 4320714, at *10 (M.D. Tenn. Oct. 26, 2010).

120. As a result of Ocwen's false representations, Jennifer suffered general and special damages in an amount to be determined at trial. Additionally, Ocwen acted with actual knowledge, malice, fraud, and/or oppression, and thus, Jennifer is entitled to an award of punitive damages.

### SEVENTH CLAIM- VIOLATIONS OF THE TRUTH IN LENDING ACT AND REGULATION Z

121. Jennifer incorporates all of the other paragraphs of this Complaint as if fully stated herein.

122. At all relevant times, US Bank was the creditor of Jennifer's loan.

123. At all relevant times, Ocwen was the servicer of Jennifer's loan and was the agent of US Bank.

124. Creditors can be held vicariously liable for their loan servicers' TILA violations. *Lucien v. Fed. Nat. Mortgage Ass'n*, 21 F. Supp. 3d 1379 (S.D. Fla. 2014).

125. Jennifer paid Ocwen $13,246.99 to pay off her mortgage in July 2015.

126. Ocwen failed to credit the payment to Jennifer's account.

127. Pursuant to 15 U.S.C.A. § 1639(f) Ocwen had a duty to credit Jennifer's payment to the loan account as of the date of receipt.

128. Rather than credit the $13,246.99 payment to Jennifer's loan account as of the date of receipt and pay off Jennifer's loan, Ocwen added additional fees and charges to Jennifer's loan and indicated in June 2016 that the payoff was $19,251.49.

129. By June 2016, Ocwen added at least $6,004.50 to Jennifer's loan even though it should have been paid off in July 2015 in the amount of $13,246.99.

130. Pursuant to 12 C.F.R. § 226.36(c)(1)(i), "no servicer shall ... [f]ail to credit a payment to the consumer's loan account as of the date of receipt."

131. US Bank is vicariously liable for Ocwen's failure to credit the $13,246.99 payment to Jennifer's loan.

132. As a result of Ocwen's failure to credit the $13,246.99 payment to Jennifer's loan as of the date of receipt, Ocwen added additional fees and charges and ultimately wrongfully foreclosed on Jennifer's house.

133. As a direct result of Ocwen's and US Bank's conduct, Jennifer suffered damages.

## EIGHTH CLAIM- UNJUST ENRICHMENT

134. Jennifer incorporates all of the other paragraphs of this Complaint as if fully stated herein.

135. Because of Ocwen's wrongful actions and/or omissions, Ocwen has been unjustly enriched at the expense of Jennifer, and thus Jennifer has been unjustly deprived of her Property, money, and personal belongings.

136. As a direct and proximate result, Jennifer seeks all available damages from Ocwen.

## NINTH CLAIM – BREACH OF CONTRACT
### In the alternative to Jennifer's other claims

137. Jennifer incorporates all of the other paragraphs of this Complaint as if fully stated herein.

138. To state a claim for breach of contract under Tennessee law, a plaintiff must allege: (1) the existence of an enforceable contract, (2) nonperformance of the contract amounting to a breach of the contract; and (3) damages caused by the breach. *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs., Ltd.*, 79 F.3d 496, 514 (6th Cir.1996) (applying Tennessee law); *C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676–677 (Tenn. Ct. App. 2007).

139. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. This implied covenant of good faith and fair dealings requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement. The covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to accomplish its purpose. This covenant protects the benefits of the contract that the parties reasonably contemplated when they enter into this agreement.

140. Jennifer had an enforceable contract with Ocwen.

141. Ocwen breached the contract through false accounting and failing to timely credit Jennifer's payments to pay off the mortgage.

142. Ocwen breached the implied covenant of good faith and fair dealing by failing to credit payments made by Jennifer to pay off the mortgage, which failure caused Ocwen to wrongfully foreclose on Jennifer's home.

143. Ocwen breached the contract by foreclosing on Jennifer's home even though she paid the mortgage in full in July 2015.

144. As a direct and proximate result of Owen's breach of contract and the implied covenant of good faith and fair dealing, Jennifer suffered damages.

## DEMAND FOR TRIAL BY JURY

Jennifer demands a trial by jury on all issues which may be determined by a jury.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, **Jennifer prays as follows:**

1. That Jennifer be awarded a compensatory and general damages judgment against the Defendants in an amount determined by the jury at trial.

2. That Jennifer be awarded a judgment against the Defendants in punitive damages in an amount to be determined by the jury at trial.

3. That Jennifer be awarded prejudgment interest at the maximum rate permitted by law against the Defendants.

4. That Jennifer be awarded such other and further relief to which she may be entitled by law.

DATED: April 25, 2017            Respectfully submitted,

*s/ Brian W. Chaiken*
Brian W. Chaiken, Esq. (118060)
bchaiken@aclaw-firm.com
Robert A. Bernstein, Esq. (111361)
rbernstein@aclaw-firm.com
ANNESSER & CHAIKEN, PLLC
2525 Ponce De Leon Blvd., Suite 625
Coral Gables, FL 33134
Telephone: (224) 305-0259
Facsimile: (305) 377-0781
*Counsel for Plaintiffs*